UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | | |
|---|---|---|
| MICHELLE GARY NORWOOD, | ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) | CV 99-BU-3235-M |
| D & F EQUIPMENT SALES; LARRY FORTENBERRY, | ) ) ) ) | |
| Defendants. | ) | |

MEMORANDUM OPINION

Plaintiff filed this case against her former employer, Defendant D&F Equipment, and the owner of D&F Equipment, Defendant Larry Fortenberry. Plaintiff alleges that she was terminated in violation of the Pregnancy Discrimination Act (PDA), Family Medical Leave Act (FMLA), and the Americans with Disabilities Act (ADA). See Doc. 1.

Defendants have filed a Motion for Summary Judgment. Doc. 31. The Court, having reviewed the record and the parties' submissions, finds that Defendants' Motion for Summary Judgment (Doc. 31) is due to be granted and Plaintiff's claims are due to be dismissed.

I.  **SUMMARY JUDGMENT STANDARD**

Summary judgment provides the parties an opportunity to test the mettle of a case before it ever reaches trial. On a motion for summary judgment, the court assesses all of the proof the parties bring to bear in order to ascertain whether there is a genuine need for

39

a trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)(quoting Advisory Committee Note to 1963 Amendment to Fed. R. Civ. P. 56(e)). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).

A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The moving party's burden is not meager; it must illuminate for the court the reasons why the nonmoving party cannot or does not raise a genuine issue of material fact sufficient to support a trial. *Id*. The moving party's burden was set forth in *Clark* as follows:

> The moving party bears the initial burden to show the district court, **by reference to materials on file**, that there are no genuine issues of material fact that should be decided at trial. **Only** when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment. *Celotex* did not change the general rule. *Celotex* simply holds that under certain circumstances the movant may meet its Rule 56 burden without negating an element of the non-moving party's claim and that under such circumstances it is sufficient to point to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden. **Even after *Celotex* it is never enough to simply state that the non-**

***moving party cannot meet its burden at trial***.

*Id*. (citing *Celotex*, 477 U.S. at 323-25, 106 S. Ct. 2553-54)(emphasis added)[1]

Once the moving party has satisfied this initial burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 523 (11th Cir. 1994). "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(e)); *see Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). However, "Rule 56 . . . does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." *Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996); *see also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."), *cert. denied sub nom.*, 516 U.S. 817, 116 S. Ct. 74, 133 L. Ed. 2d 33 (1995).

---

[1]The Eleventh Circuit recognized that *Celotex* created "an exception to the *Adickes* rule for [an] uncommon situation," i.e., "when neither party could prove either the affirmative or the negative of an essential element of the claim." *Clark*, 929 F.2d at 607, 608. In this "uncommon situation," the *Celotex* exception allows a moving party to carry its burden by showing or "pointing out," by reference to the record, that the non-moving party cannot prove its claim. *Id.* at 607. Obviously, this case does not fall into the "uncommon situation" addressed in *Celotex*.

In resolving whether a given factual dispute requires submission to a jury, the district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmoving party's favor. *Rooney v. Watson*, 101 F.3d 1378, 1380 (11th Cir. 1996)(citing *Hall v. Tallapoosa County*, 50 f.3d 159, 1581 (11th Cir. 1995). The district court must inspect the presented evidence through the looking glass of each party's substantive evidentiary burden. *Anderson*, 477 U.S. at 254-55, 106 S. Ct. at 513. However, the court must avoid weighing conflicting evidence for probity or making credibility determinations. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992). "It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather decide whether such issues exist to be tried. The court must avoid weighing conflicting evidence or making credibility determinations." *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993). At the same time, "[t]he nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; 'there must be a substantial conflict in evidence to support a jury question.'" *Tidwell v. Carter Products*, 135 F.3d 1422, 1425 (11th Cir. 1998) (citing *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.1989)).

## II.     **STATEMENT OF FACTS**

Defendant Larry Fortenberry, the owner of Defendant D&F Equipment [hereinafter D&F], hired Plaintiff Michelle Gary Norwood in 1996 for the position of Human Resources Manager. This was Plaintiff's first human resources position after she graduated college.

On March 3, 1998, Plaintiff had her first child and took six weeks FMLA leave.

When she returned to work, she was scheduled to work from 8:00 a.m. until 4:30 p.m.

In August 1998, nine months before she was terminated and several months after she returned from maternity leave, Plaintiff wrote a letter to Kathy Massey, her supervisor, which stated, in part, "I wish I did not feel obligated to do this, because Larry **already** feels that I have stirred up a lot of trouble since I have been employed here, but this is just what I feel needs doing. If I keep it bottled up inside, I'm afraid that I will not be able to maintain a high standard of workmanship." Doc. 32 (Vol. II), Exh. 8 (emphasis added). The letter goes on to request that Massey "get with [Fortenberry] and complete a list for me. I would like the list to spell out exactly what I can expect as a valued employee here with this company."[2] *Id.* A meeting was held the following day and Fortenberry memorialized it as follows:

> \*       I called Michelle Norwood and Kathy Massey into my office. I explained to Michelle in this meeting that I have heard about all I wanted to hear from her constant complaints.
>
> \*       When she asked about paid maternity leave when she had her baby I told her then D&F Equipment had no provisions for that but we would let her off as she needed as long as it was not abused.
>
> \*       I also explained that her job duties have remained the same for the past 2 years. I informed Michelle that she must do a better job with her responsibilities.
>
> \*       I told Michelle that she needed to quit taking everything so personal. She could either follow company rules of look elsewhere.

*Id.* Exh. 9.

---

[2]It is not at all clear what prompted this letter and the subsequent meeting. Apparently, it had something to do with someone -- Massey or Fortenberry -- speaking to Plaintiff about her work hours and/or leaving work.

In April 1999, at her request, Plaintiff began working 7:30 a.m. to 4:00 p.m. She was asked to return to her former work schedule of 8:00 a.m. to 4:30 p.m. by Bill Gilliland, comptroller, on May 21, 1999.[3] Gilliland testified that Fortenberry told him to change Plaintiff's work hours. Gilliland told Plaintiff, "[T]here had been some complaints off second shift. . . . They don't feel like they have the proper personnel coverage and they don't feel like they are as big a part of the company because they don't have the proper personnel coverage and we are going to need you to change your hours back to 8:00 to 4:30 so that you are staying here longer in the afternoons." Doc. 36, Plaintiff's Deposition, at 157. Plaintiff contends that she did not have a problem with changing her hours, but that she "had a problem with the fact that somebody felt like I wasn't doing my job on second shift . . . ." *Id.* at 157-58. Therefore, Plaintiff asked the second shift supervisor if he had any complaints and he told her that he did not.

Based on the statement of the second shift supervisor, Plaintiff determined that "someone was lying," and she did not believe that it was the second shift supervisor. *Id.* at 159. She was angry and concerned at this point; she went to Gilliland and Knox and asked for a second meeting regarding the complaints on second shift and the change in her work hours.

During this meeting Plaintiff told Gilliland and Knox that the second shift supervisor had told her that he did not have any complaints about her work and she told them that she

---

[3]Massey left D&F in late January 1999. Thereafter Gilliland and Dawn Knox, Systems Analyst and Fortenberry's daughter, shared the supervisory responsibilities for the office employees, including Plaintiff.

thought someone was lying. She asked them for a third meeting and for the second-shift supervisor to be present. They agreed, but that meeting never took place. Plaintiff was terminated several days later.

At the same time she was questioning the change in her work hours, Plaintiff announced to the office staff that she was pregnant again after taking a home pregnancy test at work. Fortenberry was away from the office on vacation at this time. When Knox called to tell him about the requested third meeting, she told him that Plaintiff was pregnant and that she had announced it to the front office. According to Fortenberry, he decided to terminate Plaintiff upon hearing that she had gone to talk to the second shift supervisor, but before Knox told him that Plaintiff was pregnant.

The day before her termination, a co-worker told Plaintiff that she should drop her questioning of the change in her hours because "Larry is not going to put up with [her] questioning him." Doc. 36, Plaintiff's Deposition, at 261.

On Friday morning, May 28, 1999, Fortenberry called Plaintiff to his office and gave her the opportunity to resign or, if she did not resign, he was ready to fire her. Plaintiff testified that the following occurred during this meeting:

> . . . And he said, ["]Well, Michelle, I hate to do this but I'm going to have to give you an option to either resign or I'm going to fire you.["] And I said,[" O]kay."
>
> And of course, he went[, "Y]ou have been nothing but trouble for this company since the day you started.["]  And he said[, "My managers are losing respect for you.  People laugh at you behind your back.["]  And he said[, "I] just can't have that.
>
> He went on to tell me that I had problems in my head and that if I didn't change, that I wouldn't never [sic] amount to anything.

> . . . [H]e said, ["]I'm not going to give you a reason as you should know as a human resource person why I'm asking you to either resign or be terminated.
>
> And then later in the conversation he said[, "I]f you want a reason, you should have never talked to . . . the second shift supervisor."

*Id*. at 172-73. Plaintiff testified that Fortenberry was angry about her going to see the second shift supervisor. *Id*. at 223. When Plaintiff protested that she had a clean personnel file and Fortenberry, in deciding to fire her, did not "have a leg to stand on," Fortenberry told her that he had a separate personnel file on her that contained, among other things, the letter she had written to Massey in August of the previous year and other notes on her job performance.

Fortenberry testified that he made the decision to terminate Plaintiff because she went to the second shift supervisor about the change in her hours and he considered that to be going behind his back. He also stated that he felt like he could not trust her. Among the things he considered in deciding he could not trust her was that he had been told that she tried to get D&F to pay a speeding ticket she had received, but that she said she did not want Fortenberry to know about it. Also, Fortenberry believed that she had hidden a letter from OSHA regarding unsafe working conditions. Plaintiff showed Fortenberry the letter about a month after she received it and after an article appeared in the Gadsden newspaper regarding the "risky" working conditions at D&F. Plaintiff herself testified in response to the Gadsden newspaper article that she "felt they were going to look at me and say, ["W]ell she is not doing that great of a job." *Id*. at 205. Safety was one of Plaintiff's responsibilities; she periodically held safety meetings but she had not held such

a meeting since November 1998.

Massey testified that toward the end of January 1999 when she left D&F she had informed Fortenberry that Plaintiff could not be trusted with serious company business. She also told Fortenberry that Plaintiff was not a team player. Massey, who worked for D&F for over ten years, also testified that employees that confronted or argued with Fortenberry did not do very well; she stated:

> Well, I think that when there was a situation that Michelle would say – would go to Larry [and say], "I don't agree with what you have done." And I know Michelle probably needed her job just as much as I did. I needed my job. So I avoided confrontation when at all possible. Michelle didn't.

Doc. 32 (Vol. I) at 69.

Around the first of May 1999, D&F's insurance agent, Ted Watson, called Fortenberry. Watson told Fortenberry that Plaintiff had asked him not to tell Fortenberry that the disability insurance premium was two months late. He also told Fortenberry that she had sent him an incorrect list of D&F's vehicles in response to a request from Watson's office. Fortenberry told Watson that he did not trust Plaintiff.

In April of 1999, D&F's health insurance premiums increased due to the fact that the amount of claims made against the group policy exceeded the premiums paid. Plaintiff contends that Fortenberry asked her for a list of the employees with the top twenty claims.[4] Plaintiff contends that she was in the "top twenty" because of insurance claims related to her prior pregnancy and delivery. She contends that of the twenty people on the list,

---

[4] Defendants disputed that Fortenberry asked for the list and they have presented evidence that such information was provided by the insurance carrier as part of the renewal package sent to every company the size of D&F .

thirteen -- including herself -- are no longer with D&F. There is no evidence before the Court as to the reason for these employees' separation from D&F or the medical condition underlying their insurance claims or whether these employees had also taken leave under the FMLA.

III. **DISCUSSION**

   A. **LARRY FORTENBERRY–INDIVIDUAL LIABILITY**

Defendants contend that Fortenberry, who has been sued in his individual capacity and his capacity as the president and owner of D&F , cannot be held individually liable for any cause of action set forth in Plaintiff's Complaint.[5] The Court agrees. See *Wascura v. Carver*, 169 F.3d 683, 686 (11th Cir. 1999)(FMLA); *Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996)(ADA); *Cross v. State of Ala., State Dept. of Mental Health & Mental Retardation*, 49 F.3d 1490, 1504 (11th Cir. 1995)(Title VII).

All claims against Fortenberry in his individual capacity are due to be dismissed.

   B. **D&F EQUIPMENT**

      1. **Pregnancy Discrimination Act**

Plaintiff claims that Defendant terminated her in violation of the Pregnancy Discrimination Act ("PDA"), which provides:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related

---

[5]Plaintiff does not oppose Defendants' contention that all claims against Fortenberry in his individual capacity are due to be dismissed.

> medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise. . . .

42 U.S.C. § 2000e(k). In this circuit, "[t]he analysis required for a pregnancy discrimination claim is the same type of analysis used in other Title VII sex discrimination suits." *Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1320 (11th Cir. 2000). "In proving [a sex] discrimination claim, a plaintiff can establish a prima facie case of discrimination through either direct evidence of discrimination or a variation of the four-part test outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) for circumstantial evidence." *Damon v. Fleming Supermarkets Of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999)(citing *Carter v. City of Miami*, 870 F.2d 578, 581(11th Cir.1989)). This is not a direct evidence case. Therefore, the Court will examine the evidence to determine whether Plaintiff has presented sufficient circumstantial evidence of discrimination to withstand Defendant's motion for summary judgement.

Generally, to demonstrate a prima facie case of discrimination with regard to termination, Plaintiff must show: "(1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated [non-pregnant] employees more favorably; and (4) she was qualified to do the job." *Maniccia v. Brown*,171 F.3d 1364, 1368 (11th Cir. 1999). Once Plaintiff establishes a prima facie case, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for the employment action at issue. If the employer articulates such a reason for its decision, the burden shifts back to Plaintiff to produce evidence "including the previously

produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).

Plaintiff contends that she has established a prima facie case through the following facts:

1. She was qualified for her position;

2. She was a "model employee" and she had no record of reprimands or disciplinary action at the time of her termination;

3. Fortenberry, the decision-maker, told Plaintiff that he would find a way to get rid of the 20 employees who had made the most claims against Defendant's company health care insurance policy; Plaintiff was one such employee;

4. Fortenberry knew Plaintiff was pregnant at the time he decided to terminate her.

*See* Doc. 35, p. 8. In addition she contends that she received the highest raise of any employee just months before her termination, thus demonstrating she was a valuable employee.

Plaintiff has not shown that she was treated less favorably than similarly situated employees that were not pregnant. The only comparative evidence she points to is the "top twenty" list of which thirteen employees, including Plaintiff, are no longer with Defendant. However, this evidence does not demonstrate that ***pregnant*** employees were treated less favorably than ***non-pregnant*** employees as there is no indication of the medical condition underlying the claims. Assuming as true that Fortenberry decided to

terminate all twenty employees with the highest claims against the company health insurance policy, there is no evidence that the top twenty employees were pregnant or that their insurance claims were pregnancy related. The evidence indicates nothing more than the fact that Fortenberry was concerned, unfavorably so, about the dollar amount of those claims and not about insurance claims due to pregnancy in particular.

Therefore, this Court finds that this evidence is insufficient to establish a disputed issue of material fact as to whether Plaintiff was treated less favorably than non-pregnant employees, an element of Plaintiff's prima facie case. Because Plaintiff has not established a prima facie case of pregnancy discrimination, Defendants' motion for summary judgment as to Plaintiff's PDA claim is due to be granted and Plaintiff's PDA claim is due to be dismissed.

### 2. Title VII Retaliation

In her brief in opposition to Defendants' motion for summary judgment, Plaintiff contends that she has presented sufficient evidence that Defendant retaliated against her in violation of Title VII. The Court rejects Plaintiff's argument that she has a viable Title VII retaliation claim for two reasons: (1) her complaint does not contain a retaliation claim; and (2) the alleged protected activity she alleges caused her termination -- "attempt[ing] to advise employees of the Defendant as to how to avail themselves of the provisions of the **FMLA**," Doc. 35, p. 15, is not protected by the provisions of Title VII. See 42 U.S.C. § 2000e-3 ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice **made an unlawful employment practice by this subchapter**, or because he has made a charge,

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing **under this subchapter**." (emphasis added)).

Therefore, the Court finds that Plaintiff does not have a Title VII claim for retaliation.

### 3.     Family Medical Leave Act

Defendants contend that Plaintiff cannot establish a prima facie case of a violation of the Family Medical Leave Act (FMLA) because she cannot show that she "availed" herself of a protected right under the FMLA.

There are basically two types of FMLA claims: one based on the employer's denial of the employee's substantive rights under the FMLA and one based on the employer's discrimination against the employee for engaging in activity under the FMLA. The Seventh Circuit Court of Appeals has described the two types of claims as follows:

> First, the FMLA contains prescriptive protections that are expressed as substantive statutory rights. The Act provides eligible employees of a covered employer the right to take unpaid leave for a period of up to twelve work weeks in any twelve-month period for a serious health condition as defined by the Act. 29 U.S.C. § 2612(a)(1). After the period of qualified leave expires, the employee is entitled to be reinstated to the former position or an equivalent one with the same benefits and terms of employment that existed prior to the exercise of the leave. 29 U.S.C. § 2614(a). To insure the availability of these guarantees, the FMLA declares it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided." 29 U.S.C. § 2615(a)(1).
>
> When an employee alleges a deprivation of these substantive guarantees, the employee must demonstrate by a preponderance of the evidence only entitlement to the disputed leave. In such cases, the intent of the employer is immaterial. *See Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711, 713 (7th Cir.1997) ("We shall continue to resolve suits under the FMLA . . . by asking whether the plaintiff has established, by a preponderance of the evidence, that he is entitled to the benefit he claims."); *see also Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir.1998) ( "Because the issue is the right to an entitlement, the employee

is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer.").

In addition to the substantive guarantees contemplated by the Act, the FMLA also affords employees protection in the event they are discriminated against for exercising their rights under the Act. *See* 29 U.S.C. § 2615(a)(1) & (2). Specifically, "[a]n employer is prohibited from discriminating against employees . . . who have used FMLA leave." 29 C.F.R. § 825.220(c). Furthermore, an employer may not consider the taking of FMLA leave as a negative factor in employment actions. *Id.* Because the FMLA's implementing regulations bar certain discriminatory conduct, the protections contemplated by these sections have been characterized as proscriptive in nature. *See Hodgens*, 144 F.3d at 160.

In contrast to what an employee must show to establish a deprivation of a substantive guarantee under the Act, when an employee raises the issue of whether the employer discriminated against an employee by taking adverse action against the employee for having exercised an FMLA right, the question of intent is relevant. The issue becomes whether the employer's actions were motivated by an impermissible retaliatory or discriminatory animus. *Id.* ("In such a case, the employer's motive is relevant, and the issue is whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason.").

*King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999).

Clearly, Plaintiff was not entitled to leave at the time she was discharged,[6] and she would not be entitled to leave for her pregnancy for more than six months. Also, she had been back from FMLA leave for the birth of her first child for approximately a year. Therefore, the Court finds that Plaintiff cannot establish that she was denied any substantive right guaranteed by the FMLA.

---

[6]Plaintiff was months away from the birth of her second child and there is no allegation that she had a "serious health condition" related to her pregnancy. *See* 29 U.S.C. § 2612(a)(1)(A) & (D).

Thus, to maintain her FMLA claims, Plaintiff must establish that Defendant discriminated against her on the basis of her perceived entitlement to FMLA benefits in the future.

The *McDonnell Douglas* tripartite, burden shifting analysis applies to claims of discrimination in violation of FMLA. *See Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000). "To state a claim under the FMLA, a plaintiff must prove three elements at trial: (1) he availed himself of a protected right under the FMLA; (2) he suffered an adverse employment decision; and (3) there is a causal connection between the protected activity and the adverse employment decision. *Id.* Defendant contends that Plaintiff has not availed herself of any protected right under the FMLA. In other words, Defendants contend that there is no protected activity with regard to the FMLA.

Plaintiff testified in her deposition that she believed she was terminated because she might apply for FMLA leave six months later. In her brief, Plaintiff argues:

> First of all the Plaintiff previously used FMLA with a prior pregnancy, which was the reason she was among the top 20 employees that Fortenberry declared that he would "find a way to get rid of." Now as the Plaintiff is about to need to use her FMLA, she too is "gotten rid of" because she needs to avail herself of the right. For the defense to proffer that she would only be able to avail herself of the right "in the future" is yet another example of sex discrimination since, unlike men, childbirth is a condition that does not occur in a manner that the employee can discover the need for leave immediately, rather than the need to avail herself is of biological necessity around nine months from the date of the discovery of the need.

Doc. 37, p. 14. Plaintiff cites no cases from the Eleventh Circuit Court of Appeals and the Court could find no binding caselaw regarding Plaintiff's theory that her FMLA claim can be based on the "threat" of future protected activity. The Court, although not

unsympathetic to Plaintiff's argument, will not expand the established caselaw to include "threatened" protected activity.

Accordingly, the Court finds that Plaintiff has failed to establish a prima facie case of discrimination in violation of the FMLA. Defendants' motion for summary judgment is due to be granted and Plaintiff's FMLA claim is due to be dismissed.

### 4. Americans with Disabilities Act

In her complaint, Plaintiff alleges that she was terminated on the basis of a perceived disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12102(2)(C). She alleges that Fortenberry told her, at the time he fired her, that she "had a problem in her head" and that she should "seek help or she would be a failure in life." Defendants argue that this statement[7] does not support a finding that Fortenberry regarded Plaintiff as having a mental impairment or that this impairment substantially limited a major life activity. In her brief in opposition to Defendants' motion for summary judgment, Plaintiff contends that Fortenberry's statement establishes that he regarded her as having an impairment; however, she does not offer any evidence or argument that Fortenberry considered her disabled.

The United States Supreme Court has provided the following guidance with regard to allegations of perceived disability:

> Under subsection (C), individuals who are "regarded as" having a disability are disabled within the meaning of the ADA. See § 12102(2)(C). Subsection (C) provides that having a disability includes "being regarded as having," § 12102(2)(C), "a physical or mental impairment that substantially limits one

---

[7]Defendants dispute that Fortenberry ever made such a statement.

or more of the major life activities of such individual," § 12102(2)(A). There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical [or mental] impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual--it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting. These misperceptions often "resul[t] from stereotypic assumptions not truly indicative of ... individual ability." *See* 42 U.S.C. § 12101(7). *See also School Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 284, 107 S. Ct. 1123, 94 L. Ed. 2d 307 (1987) ("By amending the definition of 'handicapped individual' to include not only those who are actually physically impaired, but also those who are regarded as impaired and who, as a result, are substantially limited in a major life activity, Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment"); 29 C.F.R. pt. 1630, App. § 1630.2(l) (explaining that the purpose of the regarded as prong is to cover individuals "rejected from a job because of the 'myths, fears and stereotypes' associated with disabilities").

*Sutton v. United Airlines, Inc.*, 527 U.S. 471, ___, 119 S. Ct. 2139, 2149-50, 144 L. Ed. 2d 450 (1999).

Plaintiff adamantly contends that she does not have a mental impairment. Thus, she must show that Defendants "mistakenly believe[ ] that [she had] a physical [or mental] impairment that substantially limits one or more major life activities." *Id*. Plaintiff has failed to identify any major life activity that Fortenberry believed to be substantially limited by the "problems in [Plaintiff's] head." However, at best, the context of the statement suggests that she may have been limited in her ability to interact with her co-workers or to perform her specific job to Fortenberry's expectations; but there is no evidence or allegation that Fortenberry considered her to have a **substantially limiting** mental impairment.

Therefore, the Court finds that Plaintiff has not shown a disputed issue of material fact as to her claim that she was terminated on the basis of a perceived disability. Accordingly, Defendants are entitled to judgment as a matter of law on such claim. Defendants' motion for summary judgment is due to be granted and Plaintiff's ADA claim is due to be dismissed.

### III. CONCLUSION

Based on the foregoing, the Court finds no disputed issue of material fact and Defendants are entitled to judgment as a matter of law as to all claims of Plaintiff.

The Court will enter an Order contemporaneously herewith in accordance with this Memorandum Opinion.

DONE this 20th day of September, 2000.

_____
H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE